UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| SBA TOWERS V, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:15-cv-00139-TWP-TAB |
| | ) |
| CITY OF MADISON BOARD OF ZONING APPEALS, | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Before the Court is Plaintiff SBA Towers V, LLC's ("SBA") Motion for Partial Summary Judgment (Filing No. 38) and a Cross-Motion for Summary Judgment[1] filed by Defendant City of Madison Board of Zoning Appeals ("the Board") (Filing No. 48). SBA alleges that the Board violated the Telecommunications Act of 1996, 47 U.S.C. § 332(c) ("Telecommunications Act"), when it denied SBA's application to construct a 190 foot wireless communication tower in Madison, Indiana. (Filing No. 1 at 1.) For the following reasons, the Court **DENIES** SBA's Motion for Partial Summary Judgment and **GRANTS** the Board's Motion for Summary Judgment as to Count 1 of SBA's Complaint.

**I. BACKGROUND**

The facts in this matter are not in dispute. SBA provides infrastructure to support wireless voice and data products and services. (Filing No. 39-2 at 1.) SBA creates and maintains a network

---

[1] SBA asserted two counts in its Complaint (Filing No. 1) for both effective prohibition and substantial evidence under the Telecommunications Act. Although the Board did not file a "partial" motion for summary judgment, SBA only seeks partial summary judgment as to its substantial evidence claim and neither party addressed the effective prohibition claim. Thus, both parties' motions will be treated as motions for partial summary judgment.

of "cell sites" upon which wireless carriers may place antennas and related equipment designed to send and receive radio signals. ([Filing No. 39-2 at 2](Filing No. 39-2 at 2).)

SBA submitted applications for both a Special Exception and a Variance Permit to the Board to construct a new wireless communication facility located at 1885 Farmers Trail, Madison, Indiana. ([Filing No. 49-3 at 1-2](Filing No. 49-3 at 1-2).) The purpose of the facility was to improve signal coverage in and around the City of Madison. ([Filing No. 39-2 at 2](Filing No. 39-2 at 2).) The proposed tower was a 190-foot wireless telecommunications monopole with a 5- foot lightning rod. ([Filing No. 49-3 at 12](Filing No. 49-3 at 12).) The area in which SBA wanted to place its tower is designated a Residential Agriculture area under the City of Madison Zoning Ordinance (the "Zoning Ordinance"). ([Filing No. 49-3 at 1-2](Filing No. 49-3 at 1-2).) The area is commonly known as Ryker's Ridge. ([Filing No. 49-2 at 8](Filing No. 49-2 at 8).)

**A.**    **Zoning Ordinance**

The Zoning Ordinance provides that all wireless telecommunications facilities shall require a Special Exception Approval from the Board of Zoning. ([Filing No. 49-5 at 1](Filing No. 49-5 at 1).) Placing a telecommunication tower in a Residential Agricultural area requires that the facility must: (1) be set back from any property line a distance equal to at least 100% of the tower; (2) not exceed a maximum height of 100 feet with accessories not exceeding fifteen-feet; (3) provide a minimum of three (3) additional antenna sites; (4) be of a monopole design; and (5) be camouflaged through the use of color, materials and landscaping as specified by the Department of Planning and Zoning. ([Filing No. 39-4 at 1](Filing No. 39-4 at 1).)

Residential Agricultural area requirements also state that all wireless telecommunications facilities meet all other requirements of the Zoning Ordinance. ([Filing No. 39-4 at 1](Filing No. 39-4 at 1).) The Zoning Ordinance also delineates nine standards in the Zoning Ordinance for General Standards Applicable to All Conditional Uses ("Conditional Uses"):

1. Is in fact a conditional use as established under the provisions of Article V and appears on the Official Schedule of Uses adopted by Section 7.00 for the zoning district involved;

2. Will be harmonious with and in accordance with the general objectives, or with any specific objective of the City's comprehensive plan and/or the zoning ordinance;

3. Will be designed, constructed, operated, and maintained so as to be harmonious and appropriate in appearance with the existing or intended character of the general vicinity and that such use will not change the essential character of the same area;

4. Will not be hazardous or disturbing to existing or future neighboring uses;

5. Will be served adequately by essential public facilities and services such as highways, streets, police and fire protection, drainage structures, refuse disposal, water and sewer, and schools; or that the persons or agencies responsible for the establishment of the proposed use shall be able to provide adequately any such services;

6. Will not create excessive additional requirements at public expense for public facilities and services and will not be detrimental to the economic welfare of the community;

7. Will not involve uses, activities processes, materials, equipment and conditions of operation that will be detrimental to any persons, property, or the general welfare by reason of excessive production of traffic, noise, smoke, fumes, glar[e], or odors;

8. Will have vehicular approaches to the property which shall be so designed as to not create an interference with traffic on surrounding public thoroughfares; and

9. Will not result in the destruction, loss, or damage of natural, scenic, or historic features of major importance.

(Filing No. 39-3 at 119.)

B. **Zoning Hearing**

SBA presented its applications to the Board on August 17, 2015. (Filing No. 49-2 at 3.) The details of the hearing were documented in the Madison City Board of Zoning Appeals' Minutes ("Minutes"), which included the deliberations and voting by Board members. (Filing No. 49-2.)

SBA presented its case through its attorney, Richard Riley, who gave the Board materials from previous applications filed by SBA to demonstrate "the amount of work, time, and effort that has gone into siting this particular facility." ([Filing No. 49-2 at 3](#).) Riley also showed the Board a three minute video. ([Filing No. 49-2 at 3](#).) Riley then detailed the various steps taken to find a suitable location for a wireless facility. ([Filing No. 49-2 at 3](#).) He stated that the tower was needed to improve 4G coverage and call reliability in the area. ([Filing No. 49-2 at 3](#).) Riley further described the parameters of SBA's search to determine this location for the tower. ([Filing No. 49-2 at 4](#).)

Riley then showed the Board a picture of the tower and showed an aerial view to "see how it would be in relation to some of the buildings, tree lines." ([Filing No. 49-2 at 4](#).) He also showed a picture of the property line and a picture to illustrate the distance between the tower and residential structures. ([Filing No. 49-2 at 4](#).) Riley noted that the proposed tower would have five additional carriers in addition to Verizon, which "would probably guarantee that no other towers are going to be built in the immediate vicinity." ([Filing No. 49-2 at 4](#).)

Riley discussed the three separate sets of standards that SBA had to meet to satisfy the Zoning Ordinance. ([Filing No. 49-2 at 4-5](#).) He presented a PowerPoint slide that was a summary of the residential district regulations and general requirements. ([Filing No. 49-2 at 5](#).) Riley stated that the regulations first required SBA to acquire a Special Exception, which is what it had applied for. ([Filing No. 49-2 at 5](#).) He also described SBA's efforts to comply with the setback requirement and stated that the location of the proposed tower would satisfy this standard. ([Filing No. 49-2 at 5](#).) Riley also noted the 100 foot maximum height requirement, but made no mention of the 90 foot height variance that SBA applied for. ([Filing No. 49-2 at 5](#).) Nonetheless, SBA's applications indicated the need for the variance in order to meet Verizon's coverage needs. (Filing

4

No. 49-5 at 40.) Riley stated that Zoning Ordinance's requirement that a minimum of three sites be on the tower would be satisfied and that the proposed tower would have a total of five additional sites. (Filing No. 49-2 at 5.) Riley further described the benefits of the monopole design. (Filing No. 49-2 at 5.)

Riley read the Board the requirement that "[a]ll telecommunication towers should be camouflaged through the use of color, materials, landscaping as specified by the Dept. of Planning & Zoning." (Filing No. 49-2 at 5.) He then noted various ways to camouflage a tower, one of which used to be painting. (Filing No. 49-2 at 5.) He also mentioned the possibility of using galvanized metal finish on the monopole towers, which is the most requested type of finish, but stated that the finish weathers in about six months to a year. (Filing No. 49-2 at 5.)

Riley spoke about the Zoning Ordinance's requirement that towers "be designed to blend into the surrounding environment through the use of color, camouflage, and architectural treatment." (Filing No. 49-2 at 6.) Riley conceded that "there are very few options to camouflage a tower[,] especially at a height of 190-ft." (Filing No. 49-2 at 6.)

After speaking to a few more of the requirements for towers under the Zoning Ordinance, Riley introduced Matthew Holtkamp, an architectural historian who works for EBI Consulting. (Filing No. 49-2 at 6.) EBI Consulting was contracted by SBA to complete the regulatory review process under the Historic Preservation Act. (Filing No. 49-2 at 6.) Holtkamp stated that the Indiana State Division of Historic Preservation ("Preservation Division") agreed that the tower would not adversely affect any historic properties in the area. (Filing No. 49-2 at 7.) Due to the increase in tower height, the Preservation Division required EBI Consulting to perform a balloon test to simulate tower height, which involved floating two four foot diameter red balloons to the proposed tower height for four hours to provide perspective on the tower's height. (Filing No. 49-

2 at 7.) The test was performed to ensure the visual accuracy of the particular tower height in question. (Filing No. 49-2 at 7.) Holtkamp presented photographs of the balloon test to the Board from various locations where the tower would be visible. (Filing No. 49-2 at 7.)

Following Holtkamp's presentation, Riley concluded that the tower should not be visible from the historic district of Madison. (Filing No. 49-2 at 7.)

Attorney Patrick McGrath spoke on behalf of a group of adjoining landowners who oppose the proposed tower that called themselves the Ridge Runners. (Filing No. 49-2 at 7.) McGrath stated that the Ridge Runners were a large part of the Madison community who did not want to see "the pristine fields become a forest of cell towers." (Filing No. 49-2 at 8.)

McGrath, citing SBA's applications for the tower, noted that the variance could not be granted unless SBA demonstrated that the tower would not diminish the taxable land value of the surrounding properties. (Filing No. 49-2 at 8.) McGrath stated that there "has been no mention from Verizon of any indication of how this is going to impact the surrounding properties." (Filing No. 49-2 at 8.) He further argued that SBA had not met its burden to meet the requirements for a variance. (Filing No. 49-2 at 8.) McGrath then discussed the nine requirements for a Conditional Use and noted that three of the nine were particularly important in this instance: (1) the requirement that the proposed use be harmonious and appropriate in appearance with the existing or intended character of the general vicinity; (2) the requirement that the tower will not be hazardous or disturbing to existing or future neighbors; and (3) the requirement that the proposed use will not damage or result in the loss of natural scenic or historic features of major importance. (Filing No. 49-2 at 8.) McGrath asserted that the proposed tower would "definitely be a repugnant eyesore, it is not something that is going to be in keeping with the character of Ryker's Ridge." (Filing No. 49-2 at 8.) McGrath concluded by noting that the cell tower would not be aesthetically and

architecturally compatible with its environment, which is required under the Zoning Ordinance. ([Filing No. 49-2 at 9](#).)

Ben Kelley was the next to present in opposition to SBA's proposed tower. ([Filing No. 49-2 at 9](#).) Kelley showed the Board a picture of the balloon test and noted that the area was a pristine environment. ([Filing No. 49-2 at 9](#).) Kelley stated that twenty to thirty homes would be affected by the tower's construction. ([Filing No. 49-2 at 9](#).) Kelley displayed pictures of the area that would be in view of the proposed tower. ([Filing No. 49-2 at 9-10](#).)

Next to present was Greg Sekula, the Southern Regional Director of Indiana Landmarks, Inc., who spoke about an evaluation of the properties in Ryker's Ridge. ([Filing No. 49-2 at 10](#).) The evaluation identified several historic properties that would be affected by the proposed tower. ([Filing No. 49-2 at 10](#).) Sekula stated that there was a strong "concentration of historic properties that suggest to me very strongly that we have a potential rural historic district" in Ryker's. ([Filing No. 49-2 at 10](#).) He also discussed how the Ryker's Ridge Baptist Church served as an important station for the Underground Railroad. ([Filing No. 49-2 at 11](#).)

Kelley again took the floor and presented independent research he performed on the future of cell towers. ([Filing No. 49-2 at 11-13](#).) Kelley brought up various alternatives to cell towers, including the use of a fiber optic antenna system that is attached to buildings and do not result in a highly visible tower. ([Filing No. 49-2 at 12](#).) He stated that small cell solutions, which are attached inconspicuously on existing right-of-way infrastructures or on rooftops, are becoming increasingly more popular and would be more suitable than the proposed tower. ([Filing No. 49-2 at 12](#).)

The Board next heard from audience members who opposed the tower, the first of whom was Elizabeth Chapa. ([Filing No. 49-2 at 13-14](#).) Chapa expressed concern that other towers

would be forthcoming despite SBA's assurances to the contrary. (Filing No. 49-2 at 13-14.) Audience member Gene Riedel, an adjoining property owner to the property on which the tower was to be located, stated that his family had owned the farm on which he lived since 1869. (Filing No. 49-2 at 15.) Riedel stated, "I'm 70 years old, I've never lived any place but Ryker's Ridge and I think a lot of people have moved to Ryker's Ridge because of its unique character and I would like to keep it that way." (Filing No. 49-2 at 15.) Audience member Zack Laughlin claimed that he lived 400 feet from the proposed tower's location and urged the Board to vote against the tower to preserve the "beautiful rural community" of Ryker's Ridge. (Filing No. 49-2 at 15.) Laughlin also stated that he spoke to his brother, a realtor, who stated that the proposed tower "will absolutely effect the value of [his] home." (Filing No. 49-2 at 15.) The Board heard from two additional audience members who expressed similar concerns about SBA's applications. (Filing No. 49-2 at 16.)

Following the audience's questions, Nate Meyer of PBM Wireless spoke on behalf of SBA's applications. (Filing No. 49-2 at 16.) Meyer stated that SBA hired numerous experts to ensure that SBA's applications complied with the Zoning Ordinance. He stated that he believed SBA's applications met the Zoning Ordinance criteria. (Filing No. 49-2 at 16.) He continued, "[The Zoning Ordinance] doesn't say somewhere unless 100 angry people come and don't like it[.] There is criteria that we have to meet. We have done a lot of homework, a lot of money and time into making sure that we meet those criteria." (Filing No. 49-2 at 16.)

Kerwin Masten, an engineer for Verizon Wireless, stated that Verizon had exhausted the cell site that it currently operates on, which is why the new tower is necessary. (Filing No. 49-2 at 17.) Masten cautioned that emergency services also require this type of technology and the proposed tower would ensure an adequate response in case of a catastrophe. (Filing No. 49-2 at

17).) He then discussed the alternatives that Kelley brought up and noted the difficulty in achieving those aims because of cost and distance to be covered. (Filing No. 49-2 at 17.) Masten stated that the alternatives would be suitable for downtown, but not for this particular area in which SBA sought coverage. (Filing No. 49-2 at 17.)

Board member C. Stutler asked SBA why SBA did not place the tower "behind trees or something so it wasn't sitting out in one big vacant field[?]" (Filing No. 49-2 at 17.) Masten answered that the proposed location was in the middle of the land, which provides the best coverage. (Filing No. 49-2 at 17-18.) Riley stated that the reason for the location in the middle of the field was to ensure compliance with the Zoning Ordinance's setback requirement. (Filing No. 49-2 at 18.)

Attorney Riley concluded by addressing SBA's applications in conjunction with the nine requirements for obtaining a Conditional Use under the Zoning Ordinance. (Filing No. 49-2 at 18-21.) Riley stated that the proposed tower would be harmonious and in accordance with the general objectives of the Zoning Ordinance because it would accomplish the goal of reducing the number of towers. (Filing No. 49-2 at 19.) He believed that it would be "highly unlikely" that any further towers would be built near the proposed location. (Filing No. 49-2 at 19.)

With respect to the aesthetic impact on the area, Riley alluded to the possibility of disguising the tower as a tree, but noted the difficulty in doing so given the tower's height. (Filing No. 49-2 at 19.) Nonetheless, he stated that camouflaging the tower as a tree "might be an option if in fact we can secure the approval, the corporate approval to do something like that. It is an extraordinary thing to do. I have never seen one go up." (Filing No. 49-2 at 19.) Riley claimed that camouflaging the tower would be a costly endeavor and would impede the tower's ability to accommodate other carriers, but "it might be a solution." (Filing No. 49-2 at 19.)

## C. Zoning Board Deliberations

The Board then voted on the nine criteria under the Zoning Ordinance to obtain a conditional use. (Filing No. 49-2 at 22-24.) Prior to voting, Board member C. Stutler told the other members of the Board that "as we go through this in very short words we need to tell why or why not so that they go with the record of what we have done." (Filing No. 49-2 at 22.)

The Board went over each standard and then voted whether or not it had been met, with each Board member providing a brief explanation after casting their vote. (Filing No. 49 at 22-24.) The Board's voting and accompanying commentary were memorialized in the Findings of Fact. (Filing No. 39-6.) The majority of the Board found in favor of SBA's applications on Standards 1, 2, 4, 5, 7, and 8. (Filing No. 39-6.)

With respect to Standard 3, which requires a design that is harmonious to the existing or intended character of the area, the Board voted 3-1 against SBA. (Filing No. 39-6 at 2.) C. Stutler stated, "No. It is not harmonious with what is up there a peaceful, tranquil, agricultural community. And it never was addressed except anywhere in pictures what that tower is going to look like to the people that live right across the street from it." (Filing No. 39-6 at 2.) C. Sauer concurred, "I would say 'no' for the same reasons. I don't feel like it is appropriate for the neighborhood and []regardless, it's a tower, you know they all look the same in my opinion. But it is not harmonious or appropriate in my opinion for that location up there." (Filing No. 39-6 at 2.) P. Robinson voted, "No. I don't feel it maintains the character [or] the appearance of the existing area of the homes and that type of area, agricultural area." (Filing No. 39-6 at 2.) G. Guarino was the only member that voted in favor of SBA, who stated that "it looks like to me under the ordinance that they met this issue under their buffer requirements and other general requirements." (Filing No. 39-6 at 2.)

The Board also voted against SBA on Standard 6, which states that the Conditional Use "Will not create excessive additional requirements at public expense for public facilities and services and will not be detrimental to the economic welfare of the community." ([Filing No. 39-6 at 3](#).) Three of the Board members voted against SBA and cited the affect that the proposed tower would have in diminishing property values. ([Filing No. 39-6 at 3](#).)

The Board was split on Standard 9, which ensures that the Conditional Use will "not result in the destruction, loss or damage of a [sic] natural, scenic, or historic features of major importance." ([Filing No. 39-6 at 4](#).) Two of the Board members found that the proposed tower would destroy the natural scenic area and two of the members found no major loss to any of these features at the proposed site. ([Filing No. 39-6 at 4](#).)

Following deliberations on the nine standards, the Board voted 3-1 to deny SBA's Special Exception application. ([Filing No. 39-6 at 4-5](#).)

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only where there exists "no genuine issue as to any material facts and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."

*Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007) (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 105, 1072 (S.D. Ind. 1995) (citations omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp.*, Inc., 129 F. 3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id*. at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

### III. DISCUSSION

Both parties move for summary judgment. SBA challenges the Board's Findings of Fact, arguing that the Board's decision to deny SBA's application was not supported by substantial evidence. (Filing No. 39.) SBA alleges that the Board's decision with respect to Standards 3, 6,

and 9, does not comport with the objective criteria set forth in the Zoning Ordinance. SBA also claims that the Board's Findings of Fact are merely a summary of the Standards for a Conditional Use and therefore does not allow for adequate judicial review. (Filing No. 39.)

The Board argues that its decision was based on substantial evidence as illustrated by the lengthy proceedings set forth in the Minutes, which demonstrate that it considered substantial evidence in rendering its decision. (Filing No. 39.)

### A. Legal Standard

The Telecommunications Act requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). "The purpose of the 'in writing' requirement is to allow for meaningful judicial review of local government actions relating to telecommunications towers." *Helcher v. Dearborn Cty.*, 595 F.3d 710, 718 (7th Cir. 2010). "The substantial evidence standard is highly deferential to the local government body making the determination." *Id*. at 723. Accordingly, "a decision 'in writing' is adequate if it provides an explanation that allows us, in combination with the written record, to determine if the decision is supported by substantial evidence." *Id*. at 719.

### B. Substantial Evidence

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Voice Stream Minneapolis, Inc. v. St. Croix Cty.*, 342 F.3d 818, 830 (7th Cir. 2003) (quoting *Aegerter v. City of Delafield, WI*, 174 F.3d 886, 889 (7th Cir. 1999)). The party seeking to overturn a local board's determination bears the burden of proving that the decision is not supported by substantial evidence. *See Helcher*, 595 F.3d at 723. To determine

whether substantial evidence was considered under the Telecommunications Act, the Court applies the same review of the decisions of administrative agencies, which is clear error. *See PrimeCo Personal Commc'ns, L.P. v. City of Mequon*, 352 F.3d 1147, 1148 (7th Cir. 2003). Thus, "the relevant question is whether the Zoning Board clearly erred in refusing to issue the permit." *Helcher*, 595 F.3d at 723.

### 1. Standard 3

SBA first contends that the Board's findings against SBA on Standard 3 reflect a "generalized objection to [towers] on aesthetic grounds." ([Filing No. 39 at 10-11](#).) Standard 3 requires that Conditional Uses must "be designed, constructed, operated, and maintained so as to be harmonious and appropriate in appearance with the existing or intended character of the general vicinity and that such use will not change the essential character of the same area." (Filing No. 39-3 at 119.) It is well-established that "aesthetics may constitute a valid basis for denial of a wireless permit if substantial evidence of the visual impact of the tower was made before the board." *VoiceStream*, 342 F.3d at 831. Nonetheless, generalized expressions of aesthetic concerns, "standing alone, cannot serve as substantial evidence on which to base a wireless permit denial." *Id*.

SBA's argument fails to consider the extensive testimony and evidence presented to the Board during the August 17, 2015 hearing, which is memorialized in the Minutes. ([Filing No. 49-2](#).) The Board contends that the instant case is similar to *Helcher*, in which the court reviewed the extensive minutes as well as the zoning board members' discussion of the application in question in making its determination as to whether the board considered substantial evidence. 595 F.3d at 719-722. The *Helcher* court found that the "[m]inutes clearly delineate the issues that arose with the application, the evidence that was presented by both the applicants and by the residents to the

14

Zoning Board, the concerns of the applicants and residents of the area, and the concerns of the Board members." *Id*. at 722. That court also found that the minutes cited the specific provisions the voting board members believed the application had not met and concluded that "[t]he [m]inutes thus provide an explanation that allows us, in combination with the written record, to determine if the decision is supported by substantial evidence." *Id*.

The Minutes in the instant case are similar to those found in *Helcher*: SBA sought an application for its proposed tower to increase cell phone coverage and numerous citizens that would be affected by the tower's construction protested the visual and economic detriment it would have to Ryker's Ridge. The Board also considered photographic evidence of the balloon test and how the tower would visually affect the surrounding area. In the end, the majority of the Board found that the tower would not be harmonious with the character of Ryker's Ridge and voted to deny SBA's application despite finding in SBA's favor on the majority of the Conditional Use standards. As in *Helcher*, the Board's votes cite to specific provisions, in this case the Conditional Use standards, which SBA did not meet.

SBA also argues that "the Board's 'findings' are simply conclusory statements repeating the Standard itself without any reference to specific facts in the record," which essentially claims that the Board failed to meet the "in writing" requirement of the Telecommunications Act. ([Filing No. 53 at 13](#).) But courts must keep "in mind that local zoning boards typically are not populated with lawyers much less judges, [and courts] cannot expect something akin to a judicial opinion." *Helcher*, 595 F.3d at 719. "The 'in writing' requirement is met so long as the written decision contains a sufficient explanation of the reasons for the permit denial to allow a reviewing court to evaluate the evidence in the record supporting those reasons." *Id*. Thus, the Board need not specify every piece of evidence relied upon in making its determination. It need only provide a sufficient

explanation that enables the Court to evaluate the evidence of record, in this case the Minutes, that supports those reasons. Having reviewed the Board's determination in conjunction with the Minutes, and given our highly deferential review of the Board's determination, the Court finds no clear error.

Furthermore, in regard to Standard 3, SBA asserts that that the Board failed to specify the objective criteria relating to camouflaging the tower, which in turn means that the Board could not objectively determine whether the proposed tower was "designed, constructed, operated, and maintained so as to be harmonious and appropriate in appearance with the existing or intended character of the general facility…". (Filing No. 39; Filing No. 39-4 at 1; Filing No. 39-3 at 119.) SBA cites to Section 155.01(1)(f) of the Zoning Ordinance section regulating telecommunications facilities, which states that "All telecommunications towers shall be camouflaged through the use of color, materials and landscaping as specified by the Department of Planning and Zoning." (Filing No. 39-4.) SBA reads this as imposing an affirmative burden on the Board to instruct SBA on how to camouflage its proposed tower. (Filing No. 39 at 11-12.) Although the Board failed to respond to this argument, a plain reading of this language imposes no such burden on the Board; it simply states that all towers must be camouflaged in the manner specified by the Department of Planning and Zoning. (Filing No. 53 at 4; Filing No. 39-4.) Nothing would suggest, nor has any evidence been presented, that the Board had an affirmative duty to tell SBA how to camouflage the proposed tower and therefore SBA's argument fails.

### 2. **Standard 6**

SBA also argues that the Board misinterpreted Standard 6. (Filing No. 39 at 12-14.) Three of the four Board members voted against SBA's application on this standard and in support cited the tower's negative affect on property values. (Filing No. 39-6 at 3.) Standard 6 states that a

Conditional Use "[w]ill not create excessive additional requirements at public expense for public facilities and services and will not be detrimental to the economic welfare of the community." (Filing No. 39-3 at 119.) An audience member testified at the hearing that a loss in property value would occur if the tower was constructed in the area. (*See* Filing No. 49-2 at 15.) SBA does not challenge this evidence at this stage in the proceedings, nor did it attempt to do so during its presentation to the Board. Rather, SBA claims that three of the Board members misunderstood the criteria under this standard, which SBA interprets as being "concerned with a detrimental effect on the economic welfare of the community due to added public expense through additional public services and public facilities that would be required as a result of the operation of the Facility." (Filing No. 39 at 12.) Once again, SBA attempts to manipulate the terms of the standard to suit its purpose, but its effort is unavailing. Standard 6 examines both the economic impact on the public expenses for use of public facilities *and* ensures that the proposed use will not be detrimental to the economic welfare of the community. (Filing No. 39-2 at 119.) Adopting SBA's interpretation of Standard 6 would render the latter clause of Standard 6 wholly superfluous. A plain reading of Standard 6 suggests that both of these possibilities must be considered prior to issuance of a conditional use. The fact that the majority of the Board found the economic detriment to the community to be of greater significance merely informs the Court of what the Board considered important between the two factors. This in turn allows for "meaningful judicial review."[2] *Helcher*, 595 F.3d at 718. Accordingly, SBA has failed to establish that the Board clearly erred in evaluating Standard 6.

---

[2] SBA cites to Board member Guarino's vote as the proper interpretation of Standard 6. (Filing No. 39 at 12-13.) On Standard 6, Guarino voted "[y]es. I put 'yes' because I think there will be no additional or added expense requirements at public expense." (Filing No. 39-6 at 3.) Guarino did not, however, discuss the economic impact that the proposed tower would have on the community.

## IV. CONCLUSION

A review of the Minutes and the Board's Findings of Fact demonstrate that it considered sufficient evidence in denying SBA's applications for a permit. Thus, SBA has failed to demonstrate that the Board clearly erred in denying its applications. Accordingly, the Court **DENIES** Plaintiff SBA Towers V, LLC's Motion for Partial Summary Judgment ([Filing No. 38](#)) and **GRANTS** Defendant City of Madison Board of Zoning Appeals' Cross Motion for Summary Judgment as to Count 1 ([Filing No. 48](#)) of the Complaint.

Count II of the Complaint remains scheduled for final pretrial conference on October 11, 2017 and trial on November 6, 2017.

**SO ORDERED.**

Date: 5/9/2017

*[signature]*

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Joshua James Burress
BINGHAM GREENEBAUM DOLL LLP
jburress@bgdlegal.com

Matthew M. Price
BINGHAM GREENEBAUM DOLL LLP
mprice@bgdlegal.com

Scott R. Leisz
BINGHAM GREENEBAUM DOLL LLP
sleisz@bgdlegal.com

David Richard Sutter
JENNER, PATTISON, HENSLEY & WYNN, LLP
dsutter@wjennerlaw.net

William Joseph Jenner
JENNER, PATTISON, HENSLEY & WYNN, LLP
jjenner@wjennerlaw.net